UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
TAMMY LOCKHARDT, o/b/o ANDY NAZARIO,:
                                                        :
                        Plaintiff,                      :
                                                        :          **MEMORANDUM & ORDER**
                -against-                                :             05-CV-2410(DLI)
                                                        :
                                                        :
JO ANN B. BARNHART,                                     :
COMMISSIONER OF SOCIAL SECURITY,                        :
                                                        :
                        Defendant.                      :
-------------------------------------------------------------x

**DORA L. IRIZARRY, U.S. District Judge:**

On January 9, 2004, plaintiff Tammy Lockhardt ("plaintiff") filed an application for

Supplemental Security Income ("SSI") payments on behalf of her son Andy Nazario ("Andy"), a

child under 18 years of age. She alleged that Andy became disabled as of December 17, 1998 due

to lead poisoning, asthma and a learning disability. (Tr. 43C-43G)[1]. The Commissioner denied the

application on April 21, 2004. (Tr. 24). Plaintiff requested and received a hearing before the an

Administrative Law Judge "ALJ" at which time she and her son testified. (Tr. 28-43, 302-347). By

decision dated January 20, 2005, the ALJ concluded that Andy was not disabled within the meaning

of the Social Security Act because, although Andy has severe impairments, the impairments do not

meet or medically equal and are not the functional equivalent of a listed impairment found in 20

C.F.R. part 404, subpart P, appendix 1 ("the listings"). On April 5, 2005, the ALJ's decision became

the defendant Commissioner of the Social Security Administration's ("Commissioner") final

decision when the Appeals Council denied plaintiff's request for review. (Tr. 5-8). Plaintiff brought

---

[1]     "Tr." referes to the transcript of the Administrative record.

1

this action, on behalf of Andy, pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner. Pursuant to Fed. R. Civ. P. 12(c), the Commissioner now moves for judgment on the pleadings affirming the determination that Andy was not disabled because his impairments do not meet or medically equal and are not the functional equivalent of a listed impairment. Plaintiff cross-moves for judgment on the pleadings and requests that the court remand the matter back to the ALJ for further consideration. For the reasons stated below, the Commissioner's motion for judgement on the pleadings is denied and the plaintiff's motion is granted to the extent that it requests the court remand the case so that the record may be further developed and the ALJ can further explain his findings.

## I.    Summary of Facts

To make his determination that Andy was not disabled within the meaning of the Social Security Act, the ALJ examined medical records related to Andy's lead posing, asthma and academic performance, as well as reports from physiologists and the hearing testimony.

Medical Records

The record contains myriad reports from the New York City Department of Health demonstrating that Andy was exposed to lead paint at a young age. (Tr. 191, 194-204, 206-207, 209-210, 213-214). In September of 1992, Andy was admitted to the emergency room of Brookdale due to asthma (Tr. 257-266). In August of 1993 and again in July of 1994, Andy was admitted to the emergency room of Brookdale Hospital Medical Center ("Brookdale") and diagnosed with lead poisoning. (Tr. 244-256, 269-275). Andy received treatment for lead poisoning from August of 1993 through May of 1995. (Tr. 192-193, 205-208, 211-212). The treatments apparently included inspections of plaintiff's apartment as well as information provided to the family as to how they

could reduce the risk of further exposure to lead. Aside from asthma and lead poisoning, there is nothing physically wrong with Andy. (Tr. 106, 141, 162, 277).

Individual Education Programs

To demonstrate that Andy has a listed impairment, or the functional equivalent of one, the record contains evidence of Andy's academic performance from the age of seven until the when age of fourteen when the application was made for disability benefits.[2] In December of 1997, Andy was classified as learning disabled. (Tr. 138). As a part of the classification, Andy was given an Individualized Education Program ("IEP") and was provided with "[s]upplemental instructional services and counseling." (Tr. 140). The IEP paints a decidedly mixed picture of Andy's academic performance at age seven. For example, in math, the IEP notes that Andy has an "extremely limited ability to perform mental computations." (Tr. 143). His ability to comprehend oral text was "adequate" but his "comprehension of written text was restricted by weak word recognition skills." (Tr. 142). For his personality profile, the examiner noted that "Andy may be dealing with issues of emotional desperation coupled with a tendency to act out when he does not get his way." (Tr. 144). Andy was programmed into the resource room with related services and provided counseling. (Tr. 139).

Another IEP was issued in June of 1999, during the period of claimed disability. The IEP was similar to the one issued in December of 1997. Under academic management needs, the IEP

---

[2]In order to be eligible for SSI benefits, Andy's disability must have "lasted or be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 1382c(a)(3)(c). Plaintiff alleges that Andy's disability began in December of 1998. Therefore, the Court (and the ALJ) must examine evidence from December 1998 forward to determine whether Andy was disabled (or can be expected to be disabled) within the meaning of the law for a twelve-month period. Thus, the court will examine Andy's academic performance close to and after December of 1998.

noted that "Andy shows academic delays in both reading and math" and "Andy requires instructional service on a part time basis to remediate learning and/or social deficits." (Tr. 108). Under "social and emotional performance," the IEP stated that "Andy is a quiet, sensitive and shy child . . . he gets along well with his peers and teachers." (Tr. 107). Andy was placed in "general education with resource room counseling." (Tr. 102).

The final IEP included in the record is from December 18, 2003, also within the period of alleged disability. The December 2003 IEP again indicates that Andy's "academic achievement is average in basic reading skills . . .written expression . . .and broad written language." (Tr. 159). Andy's weakness is math. *Id.* The IEP states that his intelligence level is "borderline." *Id.*

School Progress Reports

The record also contains Andy's report cards for every year of school from kindergarten though seventh grade. In March 1998, when Andy was in the second grade, plaintiff received a letter from Andy's school indicating that Andy was having behavioral problems, including talking "constantly," refusing to do his work and walking around the classroom. (Tr. 96). In March 1999, when Andy was in the third grade, plaintiff was alerted that Andy may not be promoted to the next grade due to his poor academic performance. (Tr. 98). Andy repeated the third grade. (Tr. 316). In the fourth grade (2000-2001 school year), Andy's academic performance was generally satisfactory, except in math and written language, in which Andy needed improvement. (Tr. 101). Andy was also satisfactory in his personal and social development except with respect to "carries out responsibility" which needed improvement. *Id.* Andy's fourth grade teacher commented that Andy did not do his homework on a regular basis. In the fifth grade, Andy's grades were generally satisfactory, except in writing and social studies, both of which needed improvement. Andy's real

weakness was his personal and social development, which was graded as "needs improvement." (Tr. 113). Andy's teacher commented that "when Andy settles down, he does better work. He is easily distracted in school and needs to improve his work habits." (Tr. 112). Andy was required to attend summer school during the summer of 2002. *Id.* Plaintiff was notified that Andy was in danger of not being promoted to the sixth grade, but Andy apparently was promoted. (Tr. 119).

Andy had a grade point average of sixty during the sixth grade (2002-2003 school year). Tr. 94). According to his teachers, he was exceeding standards in reading, was approaching standards in writing and science, but was far below standards in math. (Tr. 94). Andy was also disruptive in class at times. Interestingly, Andy's strongest subject was physical training, in which his grade was eight-five and the teacher commented that Andy "shows self control." *Id.* Again, the report card noted that Andy was in danger of not being promoted. *Id.* Andy was required to attend summer school during the summer of 2003 and was promoted to the seventh grade. In November 2003, in the seventh grade, Andy had a grade point average of 61.3. (Tr. 93). He was far below standards in English and math, but was approaching standards in health and social studies. *Id.* In health and hygiene, Andy was exceeding standards. *Id.*

Physiologists' Reports

Andy's intelligence level was determined though a series of tests conducted on December 11 and 12, 2003. (Tr. 278). The report, prepared by Dr. Chantay Claudio, a school psychologist, portrays Andy as an average seventh grader with some academic deficiencies. (Tr. 278-282). The report does not state that Andy had any behavior or development problems. *Id.* The results of IQ testing placed Andy in the "borderline" range (a score of 71). (Tr. 281). The report also noted that Andy had "depressive tendencies" which were related to his inability to have a relationship with his

5

father due to his father's incarceration. *Id.* As part of this evaluation process, Andy's teachers submitted statements. (Tr. 288-292). The comments demonstrated that Andy was well behaved and attentive, but needed to apply himself, be more motivated and complete his homework assignments. *Id.* Several months later, in September 2004, a report was issued by Rhonda Pargirsky, a school psychologist. (Tr. 293-294). The report noted that Andy was classified as learning disabled and required additional academic support. (Tr. 294). The report further noted that Andy "struggles with reading and math grade level work." *Id.*

In February 2004, a psychologist affiliated with the New York State Office of Disability and Temporary Assistance, Karen Fowler, performed an evaluation of Andy. (Tr. 228-234). Andy was diagnosed with "[a]djustment disorder with mixed disturbance of emotion and conduct." (Tr. 228). All of Andy's functions and behavior were judged to be age appropriate. (Tr.229). Two months later, in April 2004, a doctor affiliated with the Social Security Administration, Dr. Herbert Porter, assessed Andy for the purposes of plaintiff's application. (Tr. 235-240). Dr. Porter found that Andy, although having severe impairments, did not have an impairment that meets, is medically equal or is the functional equivalent of the impairments in the listings. (Tr. 235). The report found that (1) Andy did not have a limitation in acquiring and using information; (2) Andy did not have a limitation in attending and completing tasks; (3) Andy did not have a limitation in interacting and relating with others; (4) Andy did not have a limitation in moving about and manipulating objects; (5) Andy did not have a limitation when it comes to caring for himself; and (6) Andy did not have a limitation in his health or physical well being. (Tr. 238-239). The report concluded that plaintiff's "allegations are considered to be credible, but limitations are not as severe as mother alleges." (Tr. 240).

Evidence Submitted to the Appeals Board

Plaintiff submitted to the Appeal Board several documents that were not evaluated by the ALJ, but which this court has examined in determining whether the substantial evidence supports the ALJ's findings. *See Brown v. Apfel,* 174 F.3d 59, 62 (2d Cir. 1999) ("[i]n reviewing an ALJ's decision, we consider the entire administrative record, including new evidence submitted to the Appeals Council following the ALJ's decision."). Andy's grade point average in the eighth grade was sixty-five. (Tr. 295). He was "approaching standards" in math and reading. *Id.* Despite the fact that Andy was approaching standards, plaintiff was notified that Andy was in danger of not being promoted to the ninth grade. (Tr. 296). The appeals board was also provided with a September 2004 report from two of Andy's teachers. The first teacher indicated that Andy had marked limitations in acquiring and using information and attending and completing tasks, but only a moderate limitation in his ability to interact and relate to others. (Tr. 298-299). A second teacher also found that Andy had a marked limitation in both acquiring and using information and attending and completing tasks. (Tr. 300). According to the second teacher, Andy had only a mild limitation with respect to interacting and relating to others. (Tr. 301).

Hearing Testimony

On September 21, 2004, plaintiff and Andy testified at a hearing before the ALJ. The plaintiff appeared pro se. At the hearing, plaintiff testified that Andy lives with four siblings, two of whom are on SSI. (Tr. 310). The collective $1,100 per month in benefits, plus approximately $50 in child support and $370 in food stamps is the household's only income. *Id.* Plaintiff testified that Andy was the correct size for his age. (Tr. 311-312). When asked why she believed that Andy had a marked impairment, plaintiff responded that Andy "can't concentrate in school. He's always frustrated . . . He'll just get frustrated and he won't be able to complete the work . . .He's not

comprehending how to do the work that they give him in school." *Id.* When asked about Andy's mental capacity, plaintiff described Andy as "slow." (Tr. 314-315). Plaintiff reported that Andy could not count change, and it takes him longer to do certain tasks. *Id.* Plaintiff believed that Andy was below grade level in reading, although Andy testified that his only poor subject was math. (Tr. 319-320). Andy testified that he liked school and got along well with others. (Tr. 322). With respect to Andy's ability to care for himself, plaintiff testified that Andy was "sloppy." *Id.*

Plaintiff alerted the ALJ that Andy had a forthcoming doctor's appointment which she believed would produce additional evidence. (Tr. 306). The ALJ left the record open, but the additional evidence was never submitted.

ALJ's Findings

Andy was found not to be disabled and the ALJ denied plaintiff's application. Pursuant to 20 C.F.R. 416.924, the ALJ first determined that Andy was not engaging in gainful activity. (Tr. 13). As required by the regulations, the AJL next determined that Andy's learning disability, adjustment disorder and history of lead poisoning were severe limitations. (Tr. 14). However, despite being severe, the ALJ found that Andy's impairments did not meet, medically equal and were not the functional equivalent of a listed disability listings. (Tr. 18).

To make this determination, the ALJ first reviewed the medical evidence, including the records related to Andy's two hospitalizations for lead positing. (Tr 18). The ALJ next cited to the reports issued by Andy's teachers as part of the December 11, 2003 educational evaluation. (Tr. 18; Tr. 288-292). The ALJ noted that the reports indicate that Andy was working to the best of his ability, but that he had minor behavioral problems. (Tr. 18). The ALJ also relied on Dr. Claudio's report of December 11, 2003, which indicated that Andy had low average skills in math, average

skills in other subjects, and a borderline IQ. *Id.* The IEPs, the report of Karen Fowler and the report of Rhonda Pagirsky were also noted. *Id.* The ALJ considered plaintiff's testimony regarding Andy's limitations, but discounted the testimony as not credible. (Tr. 19). The ALJ also determined that, based on the reports of Dr. Herbert Porter, Andy did not have any significant limitations. In sum, the ALJ found that Andy had (1) a less than marked limitation in acquiring and using information; (2) no limitation in attending to and completing tasks; (3) a less than marked limitation in interacting and relating with others; (4) no limitation in moving around and manipulating objects; (5) no limitation in caring for himself; and (6) no limitation in health and physical well being. (Tr. 20). Plaintiff's claim was rejected because the ALJ did not find that Andy had an impairment that resulted in limitations of functioning in at least two domains.

## II.    Discussion

### A.  Standard of Court Review

In reviewing the final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health and Human Servs.,* 685 F.2d 751, 755 (2d Cir. 1982) (citation and internal quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). Substantial evidence is "'more than a mere

scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (*quoting Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). The reviewing court is required to examine the entire record to determine whether the findings are supported by substantial evidence, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983).

In determining whether the ALJ's determination is supported by substantial evidence, the court "'must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such findings, including, any contradictory evidence and evidence from which conflicting inferences may be drawn.'" *Beckles v. Barnhart*, 340 F.Supp.2d 285, 287 (E.D.N.Y. 2004) (quoting *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991)). The court also must "keep[ ] in mind that it is up to the agency, and not this court, to weigh the conflicting evidence in the record." *Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998). Indeed, in evaluating the evidence, "the court may not substitute its own judgment for that of the Secretary, even if it might justifiably have reached a different result upon *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Secretary of Health & Human Servs.*, 733 F.2d 1037, 1041 (2d Cir. 1984)).

After its review, the district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the case for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate where "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the regulations."

*Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (collecting Second Circuit cases).

An ALJ's duty is "to investigate and develop the facts and develop the arguments for and against the granting of benefits." *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004) (citation omitted). There are special considerations when a plaintiff proceeds pro se, as is the case here. In pro se cases, "the ALJ [is] under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Rodriguez ex rel. Silverio v. Barnhart*, 02-CV-5782, 2003 WL 22709204 (E.D.N.Y., Nov. 7, 2003); *see also Caroballo ex rel. Cortes v. Apfel*, 34 F. Supp.2d 208, 214 (S.D.N.Y. 1999); *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990) ("[t]he ALJ has a duty to adequately protect a pro se claimant's rights 'by ensuring that all of the relevant facts [are] sufficiently developed and considered.'") (*quoting Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980). In practical terms, this means that where gaps in the administrative record exist, a remand for further development of the record is appropriate. *Rosa*, 168 F.3d at 82-83 (2d Cir. 1999) (citation omitted); *see also Brown*, 174 F.3d 59 (2d Cir. 1999) (finding that the responsibility of an ALJ to fully develop the record is a bedrock principle of Social Security law).

**B. Standards Governing Evaluation of a Child's Disability Claims by ALJ**

An individual under eighteen is entitled to SSI benefits if his income and assets are below a certain threshold and if he has "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(c)(I). The Code of Federal Regulations ("CFR") requires the Commissioner (through an ALJ) to employ a three-step inquiry to determine whether a child is disabled. *See* 20 C.F.R. § 416.924. First, the ALJ is required to examine whether the child is engaged in "substantial

gainful activity." *Id.* Second, the ALJ is required to determine whether the child has a severe impairment. *Id.* Third, the ALJ is required to consider whether the child's impairment "meets, medically equals, or functionally equals" any of the several hundred medical conditions in the listings. In this case, the ALJ found that Andy satisfied the first and second steps of the inquiry, but not the third in denying Andy's qualification for benefits. In applying the legal standards set forth above to the third step of the analysis, the court finds that the ALJ's determination is not supported by substantial evidence, and the ALJ committed legal error in making its determination.

Under the third step, if a child's impairment medically meets or equals a listed impairment, the child will be found disabled. *See* 20 C.F.R. § 416.926. If the child's impairment does not medically meet or equal any listed impairment, the ALJ is required to evaluate all functional limitations caused by the child's impairment. *See* 20 C.F.R. § 416.926a(a). If there is a congruence between the functional limitations caused by the child's impairment and the functional limitations caused by a listed impairment, the ALJ should find that the child's impairment is the functional equivalent of a listed impairment. *Id.*

To determine congruence, the ALJ is required to evaluate six "domains" of a functionality. *See* 20 C.F.R. § 416.926a(a)-(b). The domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others (social functioning); (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). Importantly, the child's impairment or combination of impairments will be found to functionally equal a listed impairment if the impairment results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d). A "marked" limitation is one that "interferes seriously with [the child's]

ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(I).  An "extreme" limitation is one that interferes "very seriously" with the same ability. 20 C.F.R. § 416 .926a(e)(3)(I).

There are a number of ways to combine impairments to functionally equal a listed impairment.  For example, when a child suffers from multiple impairments within a single domain, each of which, when considered separately, imposes a less-than-marked limitation, the combined result nonetheless may be marked or extreme.  *Almonte ex rel. Almonte v. Barnhart,* 03 CV 1048, 2004 WL 1242512*, \*3 (E.D.N.Y.,  May 26, 2004); *Encarnacion v. Barnhart*, 191 F.Supp.2d 463, 474 (S.D.N.Y. 2002) (finding that two less-than-marked limitations in the area of social functioning may cumulatively contribute to the finding of a marked or extreme limitation in the area of social functioning).  For a child to have a marked or extreme limitation in a particular domain, not all activities or functions encompassed by the domain need be impaired.  For instance, a twelve-year-old child could have a marked or extreme limitation in the domain of acquiring and using information if he had a serious learning disability that had prevented him from learning to read and write even though he was of normal intelligence and had good verbal communication skills. *Thompson v. Barnhart*, 02 CV 4930, 2004 WL 896663, \*5 (E.D.N.Y., Mar. 26, 2004).

In the instant matter, the ALJ's determination under the third prong is not supported by substantial evidence because there are two areas where Andy may have a marked functional limitations, either because he has multiple impairments which combine to create a marked (or extreme) impairment or because some, but not all of his functions are impaired in the domain.  The functions are (1) acquiring and using information and (2) attending and completing tasks.  Thus, the ALJ should further develop the record, paying careful attention to Andy's limitations.  Moreover,

the ALJ should consider the two reports issued by Andy's teachers in September of 2004, both of which indicate a "marked" impairment in Andy's ability to acquire and use information and also indicate a "marked" impairment in Andy's ability to attend to and complete tasks.

<u>Acquiring and Using Information</u>

The domain of "acquiring and using information" for six-to-twelve year-old children analyzes the child's ability to learn to read, write, do math, and discuss history and science, as well as the ability to demonstrate what he has learned in both academic and daily living situations. 20 C.F.R. § 416.926a(g)(2)(iv). The child should be able to "use increasingly complex language . . . to share information and ideas with individuals or groups, by asking questions and expressing [his] own ideas, and by understanding and responding to the opinions of others." Id. The record is replete with references to Andy's limitations in this domain. For example, Andy's December 1997 IEP notes an extreme limitation in Andy's ability to perform mental computations and weak word recognition skills. The June 1999 and December 2003 IEP note academic delays in reading and math. Two of Andy's teachers report that Andy has a "marked" limitation in his ability to acquire and use information. Andy's report cards also show deficiencies in reading and math and Andy had an over all score of 71 on his IQ test. All of this evidence, if properly considered, may indicate an extreme limitation in Andy's ability to acquire and use information.

With respect to the IQ test and Andy's score on standardized tests in reading and math, the regulations state that "[i]f you are a child of any age (birth to the attainment of age 18), we will find that you have a 'marked' limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in

14

domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(2)(iii). Three or more deviations below the mean demonstrates an "extreme limitation." The ALJ was presented with several years' worth of standardized reading and math tests, as well as the results of an IQ test. However, the ALJ made no effort to determine whether the test scores were either two or three deviations below the mean. Thus, the ALJ's determination is not supported by substantial evidence. Moreover, on remand, the ALJ should determine whether Andy's multiple impairments, although perhaps imposing a less-than-marked limitation when considered individually, when combined result in a marked or extreme impairment in Andy's ability to acquire and use information. *See Almonte ex rel. Almonte v. Barnhart, supra.*

<u>Attending and Completing Tasks</u>

Even if Andy's deficiency in the domain of acquiring and using information is not extreme but only marked, Andy may have a marked deficiency in the domain of attending and completing tasks, thus qualifying him for benefits. According to the regulations, the domain of attending and completing tasks involves "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h).

First, two of Andy teachers indicated that Andy had a "marked" limitation in his ability to attend and complete tasks. Andy's report cards also indicate that Andy does apply himself to school work, and does not complete his homework assignments. However, much of the evidence relating to Andy's limitations in attending and completing task comes from plaintiff's hearing testimony, which the ALJ discounted as incredible.

The ALJ committed reversible error in rejecting plaintiff's testimony. As a fact-finder, an

ALJ is free to accept or reject testimony, but the ALJ is required to explain why the testimony is being rejected with sufficient specificity. *See Carroll v. Secretary of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983). The ALJ only states that plaintiff's testimony was "not supported by the medical record." (Tr. 19). Here, a review of the record shows that plaintiff's testimony was largely consistent with the medical testimony, including the reports from Andy's teachers, IEPs and report cards, all of which demonstrate some deficiency in Andy's ability to attend and complete tasks. Therefore, on remand, the ALJ should indicate with specificity which parts of plaintiff's testimony he is rejecting and his reasons for doing so. *See Barreto ex rel. Rivas v. Barnhart*, 02 Civ. 4462, 2004 WL 1672789, *5 (S.D.N.Y., July 27, 2004).

The court is also concerned that there may be additional medical records from New York Psychotherapy and Counseling Center related to Andy's ability to attend to and complete asks that were not considered by the ALJ. An ALJ is required to obtain relevant medical records to assist a pro se claimant in developing his or her case. *Morgan v. Barnhart*, 04 CV 6024, 2005 WL 2978976 *2 (S.D.N.Y., Nov. 7, 2005); *see also*, *Rosa v. Callahan*, 168 F.3d at 80 (ALJ required to request additional records from physicians). While the Commissioner claims that the ALJ fulfilled its duty by making four requests for the absent records, the ALJ never used his subpoena power to obtain the records. *See, e.g.*, 42 U.S.C. § 405(d) ("[f]or the purpose of any hearing . . . authorized or directed under this subchapter, or relative to any other matter within the Commissioner's jurisdiction hereunder, the Commissioner of Social Security shall have power to issue subpoenas requiring the attendance and testimony of witnesses and the production of any evidence that relates to any matter under investigation or in question before the Commissioner."). On remand, the ALJ should make every effort to obtain these records, as well as records of Andy's other recent medical treatment, and

by subpoena if necessary.

Finally, listing 112.05(D) presumes disability if a child has a valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment which imposes additional and significant limitations of function. *See Castillo v. Barnhart,* 00 CV. 4343, 2002 WL 31255158, *8 (S.D.N.Y. Oct. 8, 2002). On remand, the ALJ is also directed to evaluate whether Andy, despite having an IQ barely above 70 (i.e. 71), Andy may meet the requirements of listed impairment 112.05(D).

## III.    Disposition.

Accordingly, this case is remanded to the Commissioner for further evidentiary proceedings. To prevent delay in the processing of plaintiff's case, further proceedings before the ALJ must be completed within sixty-two days of the issuance of the order, i.e. by June 19, 2007; if plaintiff's benefits remain denied, the Commissioner is directed to render a final decision within sixty days of plaintiff's appeal, if any. *See Butts v. Barnhart*, 388 F.3d 377, 388 (2d Cir. 2004) (suggesting procedure and time limits to ensure speedy disposition of Social Security cases following remand by a district court). "[I]f these deadlines are not observed, a calculation of benefits owed [to plaintiff] must be made immediately." *Id.*

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied.  The Plaintiff's motion is granted to the extent that the case is remanded to the Commissioner for further proceedings consistent with this opinion.

SO ORDERED.

DATED:  Brooklyn, New York
             April 17, 2007


_____/s/_____
             DORA L. IRIZARRY
        United States District Judge